**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| JEWANNA ASHLEY, on behalf of her minor children D.W. and D.W., and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>CLEO COMMUNICATIONS, INC.,<br><br>Defendant. | Case No. 1:25-cv-02672<br><br>CLASS ACTION<br><br>JURY TRIAL DEMANDED |

**AMENDED CLASS ACTION COMPLAINT**

Plaintiff Jewanna Ashley, on behalf of her minor children D.W. ("D.W. 1") and D.W. ("D.W. 2") ("Plaintiff"), and on behalf of all others similarly situated (collectively, "Class members"), by and through her attorneys, brings this Class Action Complaint against Defendant Cleo Communications, Inc. ("Cleo" or "Defendant"), and complains and alleges upon personal knowledge as to herself and information and belief as to all other matters.

**INTRODUCTION**

1. Plaintiff brings this class action against Cleo for its failure to secure and safeguard the personally identifying information ("PII") of her minor children D.W. 1, D.W. 2, and thousands of other individuals', including their names, dates of birth, gender, Chicago Public Schools student ID numbers, and Medicaid ID numbers and program eligibility information.

2. Cleo is a company that offers cloud-based file transfer solutions. Cleo is a third-party vendor for Chicago Public Schools ("CPS").

3. On or about March 7, 2025, CPS announced that an unauthorized third party gained access to Cleo's network systems and obtained files containing PII, including the PII of current and former CPS students, including D.W. 1, D.W. 2, and Class members (the "Data Breach").

4. Cleo owed a duty to D.W. 1, D.W. 2, and Class members to implement and maintain reasonable and adequate security measures to secure, protect, and safeguard their PII against unauthorized access and disclosure. Cleo breached that duty by, among other things, failing to implement and maintain reasonable security procedures and practices to protect Class members' PII from unauthorized access and disclosure.

5. As a result of Cleo's inadequate security and breach of its duties and obligations, the Data Breach occurred, and D.W. 1, D.W. 2, and Class members' PII was accessed and disclosed. This action seeks to remedy these failings and their consequences. Plaintiff brings this action on behalf of her minor children D.W. 1, D.W. 2, and all persons whose PII was exposed as a result of the Data Breach, which CPS announced on or about March 7, 2025.

6. Plaintiff, on behalf of her minor children D.W. 1, D.W. 2, and all other Class members, asserts claims for negligence and violations of the Illinois Consumer Fraud and Deceptive Business Practices Act, and seeks declaratory relief, injunctive relief, monetary damages, statutory damages, punitive damages, equitable relief, and all other relief authorized by law.

## PARTIES

***Plaintiff Jewanna Ashley***

7. Plaintiff Jewanna Ashley is a citizen of Illinois.

8. Plaintiff's minor children, D.W. 1, D.W. 2, are students in CPS. CPS collected, stored, and transferred D.W. 1 and D.W. 2's PII using software provided by Cleo.

9. At all relevant times, Cleo stored and maintained D.W. 1 and D.W. 2's PII on its network systems, including the systems impacted in the Data Breach.

10. Plaintiff received an email from CPS notifying her that D.W. 1 and D.W. 2's PII was in the files accessed in the Data Breach.

11. Upon learning of the Data Breach, Plaintiff spent time and effort researching the Data Breach, monitoring her financial accounts for signs of fraud, and changing passwords to her accounts to attempt to mitigate any harm to herself, D.W. 1, and D.W. 2.

12. As a direct result of the Data Breach, D.W. 1 and D.W. 2 have suffered injury and damages including, *inter alia*, a substantial and imminent risk of identity theft; the wrongful disclosure and loss of confidentiality of their highly sensitive PII; and deprivation of the value of their PII.

***Defendant Cleo Communications, Inc.***

13. Defendant Cleo Communications, Inc. is an Illinois corporation with its principal place of business located at 4949 Harrison Ave., Suite #200, Rockford, IL 61108. It may be served through its registered agent: Mahesh Rajasekharan, 4949 Harrison Ave., Suite #200, Rockford, IL 61108.

## JURISDICTION AND VENUE

14. The Court has subject matter jurisdiction over Plaintiff's claims under 28 U.S.C. § 1332(d)(2), because (a) there are 100 or more Class members, (b) at least one Class member is a citizen of a state that is diverse from Defendant's citizenship, and (c) the matter in controversy exceeds $5,000,000, exclusive of interest and costs.

15. This Court has general personal jurisdiction over Cleo because it is organized under the laws of this State and maintains its principal place of business in this District.

16. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because Defendant's principal place of business is in this District and a substantial part of the events, acts, and omissions giving rise to Plaintiff's claims occurred in this District.

## **FACTUAL ALLEGATIONS**

### ***Overview of Cleo and the Data Breach***

17. Cleo offers business software integrations services, including file transfer and storage services.[1]

18. On its website, Cleo states, "Our commitment to data privacy and security is embedded in every part of our business."[2] It further promises that it "aims to keep its Services safe for everyone and data security is of utmost priority."[3]

19. In the regular course of its business, Cleo collects and maintains the PII of individuals from its business or enterprise customers, including D.W. 1, D.W. 2, and Class members.

20. On or about March 7, 2025, CPS announced that in late 2024, Cleo experienced a data security incident in which "certain student data was accessed by an unauthorized third party."[4] CPS learned student data had been "inappropriately accessed" on or about February 8, 2025.[5] The information affected in the Data Breach includes names, dates of birth, gender, Chicago Public Schools student ID numbers, and Medicaid ID numbers and program eligibility information.[6]

---

[1] *See generally Cleo Services*, CLEO COMMC'NS, https://www.cleo.com/services-support (last accessed Apr. 14, 2025).
[2] *Cleo Trust Center*, CLEO COMMC'NS, https://trustcenter.cleo.com/(last accessed Apr. 14, 2025).
[3] *Id.*
[4] *Breach Notifications*, CHI. PUB. SCHS. (Mar. 7, 2025), https://www.cps.edu/about/policies/student-online-personal-protection-act/breach-notifications/ (last accessed Apr. 14, 2025).
[5] *Id.*
[6] *Id.*

21. CPS indicated that the Data Breach impacted "all current students and all former students dating back to the 2017-2018 school year,"[7] affecting approximately 700,000 students.[8] About 344,000 of those students had Medicaid information stolen.[9]

22. Russian hacker group Clop claimed responsibility for hacking Cleo.[10] Clop is "a prolific ransomware family that has gained notoriety for its high-profile attacks."[11] Clop is known for engaging in "double extortion" tactics where it steals and encrypts data before publishing the stolen data on its dark web leak site.[12]

23. Clop hacked into Cleo's network system using a vulnerability first disclosed in October, 2024.[13] Security researchers discovered threat actors exploiting the vulnerability "en

---

[7] ABC7 Chicago Digital Team, *Chicago Public Schools warns families of data breach including student information*, ABC 7 CHI. (Mar. 7, 2025), https://abc7chicago.com/post/chicago-public-schools-warns-families-data-breach-including-student-information-cps-vendor-cyberattack/15990545/.

[8] Sun-Times Wire, *New data breach exposes 700,000 CPS students' info*, CHI. SUN TIMES (Mar. 8, 2025 8:01 PM), https://chicago.suntimes.com/education/2025/03/08/cps-data-breach-security-technology.

[9] Mila Koumpilova, *Hackers expose information for 700,000 current and former Chicago students, district says,* Chalkbeat (Mar. 7, 2025 3:23 PM), https://www.chalkbeat.org/chicago/2025/03/07/cps-student-data-exposed-in-hacker-attack/.

[10] *See* Carly Page, *Clop ransomware gang names dozens of victims hit by Cleo mass-hack, but several firms dispute breaches*, TECHCRUNCH (Jan. 16, 2025 6:01 AM), https://techcrunch.com/2025/01/16/clop-ransomware-gang-names-dozens-of-victims-hit-by-cleo-mass-hack-but-several-firms-dispute-breaches/?guccounter=1.

[11] Trend Micro Research, *Ransomware Spotlight: Clop*, TREND MICRO (Aug. 31, 2023), https://www.trendmicro.com/vinfo/us/security/news/ransomware-spotlight/ransomware-spotlight-clop (last accessed Apr. 14, 2025).

[12] *See #StopRansomware: CL0P Ransomware Gang Exploits CVE-2023-34362 MOVEit Vulnerability*, CISA (June 7, 2023), https://www.cisa.gov/news-events/cybersecurity-advisories/aa23-158a.

[13] Page, *supra* note 10.

masse" beginning on or about December 3, 2024.[14] Clop has threatened to publish the information stolen in the Data Breach on its dark web leak site.[15]

24. The Data Breach also affected the PII of some of Cleo's other customers, including food manufacturing giant WK Kellogg Co.[16], rental car company Hertz,[17] supply chain management company Blue Yonder,[18] and Western Alliance Bank.[19] On its dark web leak site, Clop has stated at least 66 companies were targeted in the Cleo data breach so far.[20]

25. While Cleo warned CPS that student information was impacted on or about February 8, 2025, students and their families were not notified until March 7, 2025 that the Data Breach occurred and that their PII was in the hands of cybercriminals.

26. Cleo's failure to promptly notify Class members that their PII was accessed and stolen virtually ensured that the unauthorized third parties who exploited those security lapses could monetize, misuse, or disseminate that PII before Class members could take affirmative steps

---

[14] *See* Carly Page, *Hackers are exploiting a flaw in popular file-transfer tools to launch mass hacks, again*, TechCrunch (Dec. 10, 2024 3:22 AM), https://techcrunch.com/2024/12/10/hackers-are-exploiting-a-flaw-in-popular-file-transfer-tools-to-launch-mass-hacks-again/.

[15] Pierluigi Paganini, *Clop Ransomware exploits Cleo File Transfer flaw: dozens of claims, disputed breaches*, SEC. AFFAIRS (Jan. 16, 2025), https://securityaffairs.com/173135/cyber-crime/clop-ransomware-gang-claims-hack-of-cleo-file-transfer-customers.html.

[16] David Jones, *WK Kellogg confirms employee data breach tied to Cleo file-transfer flaw*, CYBERSEC. DRIVE (Apr. 8, 2025), https://www.cybersecuritydive.com/news/wk-kellogg-employee-data-breach-cleo/744739/.

[17] Zack Whittaker, *Hertz says customers' personal data and driver's licenses stolen in data breach*, TECHCRUNCH (Apr. 14, 2025 11:01 AM), https://techcrunch.com/2025/04/14/hertz-says-customers-personal-data-and-drivers-licenses-stolen-in-data-breach/.

[18] David Jones, *Blue Yonder investigating Clop ransomware threat linked to exploited Cleo CVEs*, CYBERSEC. DRIVE (Jan. 17, 2025), https://www.cybersecuritydive.com/news/blue-yonder-ransomware-cleo/737700/.

[19] Ionut Arghire, *Western Alliance Bank Discloses Data Breach Linked to Cleo Hack*, SEC. WEEK (Mar. 18, 2025), https://www.securityweek.com/western-alliance-bank-discloses-data-breach-linked-to-cleo-hack/.

[20] *See* ZeroFox Intelligence, *Flash Report: Cl0p Publishes Data of Cleo Compromise Victims*, ZEROFOX INTELLIGENCE (Jan. 20, 2025), https://www.zerofox.com/intelligence-feed/flash-report-cl0p-publishes-data-of-cleo-compromise-victims/.

to protect their sensitive information. As a result, D.W. 1, D.W. 2, and Class members will suffer indefinitely from the substantial and concrete risk that their identities will be (or already have been) stolen and misappropriated.

***Cleo Knew that Criminals Target PII***

27. At all relevant times, Cleo knew, or should have known, that the PII that it collected and stored was a target for malicious actors. Despite such knowledge, Cleo failed to implement and maintain reasonable and appropriate data privacy and security measures to protect D.W. 1, D.W. 2, and Class members' PII from cyberattacks that it should have anticipated and guarded against.

28. It is well known among companies that store sensitive personally identifying information that such information—such as the PII stolen in the Data Breach—is valuable and frequently targeted by criminals. In a recent article, *Business Insider* noted that "[d]ata breaches are on the rise for all kinds of businesses, including retailers . . . . Many of them were caused by flaws in . . . systems either online or in stores."[21]

29. PII is a valuable property right.[22] The value of PII as a commodity is measurable.[23] "Firms are now able to attain significant market valuations by employing business models predicated on the successful use of personal data within the existing legal and regulatory

[21] Dennis Green, Mary Hanbury & Aine Cain, *If you bought anything from these 19 companies recently, your data may have been stolen*, BUS. INSIDER (Nov. 19, 2019, 8:05 AM), https://www.businessinsider.com/data-breaches-retailers-consumer-companies-2019-1.
[22] *See* Marc van Lieshout, *The Value of Personal Data*, 457 Int'l Fed'n for Info. Processing 26 (May 2015) ("The value of [personal] information is well understood by marketers who try to collect as much data about personal conducts and preferences as possible . . ."), https://www.researchgate.net/publication/283668023_The_Value_of_Personal_Data.
[23] *See* Robert Lowes, *Stolen EHR [Electronic Health Record] Charts Sell for $50 Each on Black Market*, MEDSCAPE (April 28, 2014), http://www.medscape.com/viewarticle/824192.

frameworks."[24] American companies are estimated to have spent over $19 billion on acquiring personal data of consumers in 2018.[25] It is so valuable to identity thieves that once PII has been disclosed, criminals often trade it on the "cyber black-market," or the "dark web," for many years.

30. As a result of the real and significant value of these data, identity thieves and other cyber criminals have openly posted credit card numbers, Social Security numbers, PII, and other sensitive information directly on various internet websites making the information publicly available. This information from various breaches, including the information exposed in the Data Breach, can be readily aggregated with other such data and become more valuable to thieves and more damaging to victims.

31. Consumers place a high value on the privacy of their data, as they should. Researchers shed light on how much consumers value their data privacy—and the amount is considerable. Indeed, studies confirm that "when privacy information is made more salient and accessible, some consumers are willing to pay a premium to purchase from privacy protective websites."[26]

32. Given these facts, any company that transacts business with a consumer and then compromises the privacy of consumers' PII has thus deprived that consumer of the full monetary value of the consumer's transaction with the company.

---

[24] Organization for Economic Co-operation and Development, *Exploring the Economics of Personal Data: A Survey of Methodologies for Measuring Monetary Value*, OECD iLIBRARY (Apr. 2, 2013), https://www.oecd-ilibrary.org/science-and-technology/exploring-the-economics-of-personal-data_5k486qtxldmq-en.

[25] IAB Data Center of Excellence, *U.S. Firms to Spend Nearly $19.2 Billion on Third-Party Audience Data and Data-Use Solutions in 2018, Up 17.5% from 2017*, INTERACTIVE ADVERT. BUREAU (Dec. 5, 2018), https://www.iab.com/news/2018-state-of-data-report/.

[26] Janice Y. Tsai et al., *The Effect of Online Privacy Information on Purchasing Behavior, An Experimental Study*, 22(2) INFO. SYS. RSCH. 254 (June 2011), https://www.jstor.org/stable/23015560?seq=1.

***Theft of PII Has Grave and Lasting Consequences for Victims***

33. Theft of PII can have serious consequences for the victim. The FTC warns consumers that identity thieves use PII to receive medical treatment, start new utility accounts, and incur charges and credit in a person's name.[27] [28]

34. Experian, one of the largest credit reporting companies in the world, warns consumers that "[i]dentity thieves can profit off your personal information" by, among other things, selling the information, taking over accounts, using accounts without permission, applying for new accounts, obtaining medical procedures, filing a tax return, and applying for government benefits.[29]

35. Identity theft is not an easy problem to solve. In a survey, the Identity Theft Resource Center found that almost 20% of victims of identity misuse needed more than a month to resolve issues stemming from identity theft.[30]

36. There may also be time lags between when sensitive personal information is stolen, when it is used, and when a person discovers it has been used. On average it takes approximately

---

[27] *See* Federal Trade Commission, *What to Know About Identity Theft*, FTC CONSUMER INFO., https://www.consumer.ftc.gov/articles/what-know-about-identity-theft (last accessed Apr. 14, 2025).

[28] The FTC defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority." 12 C.F.R. § 1022.3(h). The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, social security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number." 12 C.F.R. § 1022.3(g).

[29] *See* Louis DeNicola, *What Can Identity Thieves Do with Your Personal Information and How Can You Protect Yourself*, EXPERIAN (May 21, 2023), https://www.experian.com/blogs/ask-experian/what-can-identity-thieves-do-with-your-personal-information-and-how-can-you-protect-yourself/.

[30] Identity Theft Resource Center, *2023 Consumer Aftermath Report*, IDENTITY THEFT RES. CTR. (2023), https://www.idtheftcenter.org/publication/2023-consumer-impact-report/ (last accessed Apr. 14, 2025).

three months for consumers to discover their identity has been stolen and used, but it takes some individuals up to three years to learn that information.[31]

37. It is within this context that D.W. 1, D.W. 2, and all other Class members must now live with the knowledge that their PII is forever in cyberspace and was taken by someone intending to use that information for any number of improper purposes and scams, including making the information available for sale on the black-market.

***Damages Sustained by Plaintiff and Class Members***

38. D.W. 1, D.W. 2, and Class members have suffered and will suffer injury, including, but not limited to: (i) a substantially increased and imminent risk of identity theft; (ii) the compromise, publication, and theft of their PII; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from unauthorized use of their PII; (iv) lost opportunity costs associated with efforts attempting to mitigate the actual and future consequences of the Data Breach; (v) the continued risk to their PII which remains in Defendant's possession; and (vi) future costs in terms of time, effort, and money that will be required to prevent, detect, and repair the impact of the PII compromised as a result of the Data Breach.

## CLASS ALLEGATIONS

39. This action is brought and may be properly maintained as a class action pursuant to Fed. R. Civ. P. 23.

40. Plaintiff brings this action on behalf of her minor children D.W. 1 and D.W. 2, and all members of the following Class of similarly situated persons:

---

[31] John W. Coffey, *Difficulties in Determining Data Breach Impacts*, 17 J. OF SYSTEMICS, CYBERNETICS AND INFORMATICS 9 (2019), http://www.iiisci.org/journal/pdv/sci/pdfs/IP069LL19.pdf.

> All persons whose personally identifiable information was accessed in the Data Breach by unauthorized persons, including all persons who were sent a notice of the Data Breach.

41. Excluded from the Class are Cleo Communications, Inc., and its affiliates, parents, subsidiaries, officers, agents, and directors, as well as the judge(s) presiding over this matter and the clerks of said judge.

42. Certification of Plaintiff's claims for class-wide treatment is appropriate because Plaintiff can prove the elements of her claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

43. The members in the Class are so numerous that joinder of each of the Class members in a single proceeding would be impracticable. Approximately 700,000 current and former CPS students were impacted in the Data Breach.[32]

44. Common questions of law and fact exist as to all Class members and predominate over any potential questions affecting only individual Class members. Such common questions of law or fact include, *inter alia*:

a. Whether Defendant had a duty to implement and maintain reasonable security procedures and practices to protect and secure D.W. 1, D.W. 2, and Class members' PII from unauthorized access and disclosure;

b. Whether Defendant had a duty not to disclose the PII of D.W. 1, D.W. 2, and Class members to unauthorized third parties;

c. Whether Defendant failed to exercise reasonable care to secure and safeguard D.W. 1, D.W. 2, and Class members' PII;

d. Whether Defendant engaged in unfair, unlawful, or deceptive practices by failing to safeguard the PII of D.W. 1, D.W. 2, and Class members;

e. Whether Defendant breached its duties to protect D.W. 1, D.W. 2, and Class members' PII; and

[32] Sun-Times Wire, *New data breach exposes 700,000 CPS students' info*, *supra* note 8.

f. Whether D.W. 1, D.W. 2, and Class members are entitled to damages and the measure of such damages and relief.

45. Defendant engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiff, on behalf of her minor children D.W. 1, D.W. 2, and all other Class members. Individual questions, if any, pale in comparison, in both quantity and quality, to the numerous common questions that dominate this action.

46. Plaintiff's claims are typical of the claims of the Class. Plaintiff's minor children, D.W. 1 and D.W. 2, like all proposed members of the Class, had their PII compromised in the Data Breach. D.W. 1, D.W. 2, and Class members were injured by the same wrongful acts, practices, and omissions committed by Defendant, as described herein. Plaintiff's claims therefore arise from the same practices or course of conduct that give rise to the claims of all Class members.

47. Plaintiff will fairly and adequately protect the interests of the Class members. Plaintiff is an adequate representative of the Class in that she has no interests adverse to, or that conflict with, the Class she seeks to represent. Plaintiff has retained counsel with substantial experience and success in the prosecution of complex consumer protection class actions of this nature.

48. A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages and other financial detriment suffered by D.W. 1, D.W. 2, and Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendant, so it would be impracticable for Class members to individually seek redress from Defendant's wrongful conduct. Even if Class members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense

to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## CAUSES OF ACTION

### COUNT I
### NEGLIGENCE

49. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

50. Cleo owed a duty to D.W. 1, D.W. 2, and Class members to exercise reasonable care in safeguarding and protecting the PII in its possession, custody, or control.

51. Cleo knew or should have known the risks of collecting and storing D.W. 1, D.W. 2, and all other Class members' PII and the importance of maintaining secure systems. Cleo knew or should have known of the many data breaches that targeted companies that collect and store PII in recent years.

52. Given the nature of Cleo's business, the sensitivity and value of the PII it maintains, and the resources at its disposal, Cleo should have identified the vulnerabilities to its systems and prevented the Data Breach from occurring.

53. Cleo's duties arise from, *inter alia*, the HIPAA Privacy Rule ("Standards for Privacy of Individually Identifiable Health Information"), 45 C.F.R. Part 160 and Part 164, Subparts A and E, and the HIPAA Security Rule ("Security Standards for the Protection of Electronic Protected Health Information"), 45 C.F.R. Part 160 and Part 164, Subparts A and C (collectively, "HIPAA Privacy and Security Rules").

54. Cleo's duties also arise from Section 5 of the FTC Act ("FTCA"), 15 U.S.C. § 45(a)(1), which prohibits "unfair . . . practices in or affecting commerce," including, as

interpreted by the FTC, the unfair act or practice by businesses, such as Cleo, of failing to employ reasonable measures to protect and secure PII.

55. Cleo's duties also arise from the Illinois Personal Information Protection Act ("IPIPA"), 815 ILCS 530/45(a) which requires:

> A data collector that owns or licenses, or maintains or stores but does not own or license, records that contain personal information concerning an Illinois resident shall implement and maintain reasonable security measures to protect those records from unauthorized access, acquisition, destruction, use, modification, or disclosure.

815 ILCS. 530/45.

56. Additionally, under 815 ILCS 530/10, Cleo had a duty to "notify the resident at no charge that there has been a breach of the security of the system data following discovery or notification of the breach . . . in the most expedient time possible and without unreasonable delay." 815 ILCS 530/10.

57. Cleo violated HIPAA Privacy and Security Rules, Section 5 of the FTCA, and IPIPA by failing to use reasonable measures to protect D.W. 1, D.W. 2, and Class members' PII, by failing to provide timely notice, and by not complying with applicable industry standards. Cleo's conduct was particularly unreasonable given the nature and amount of PII it obtains and stores, and the foreseeable consequences of a data breach involving PII including, specifically, the substantial damages that would result to Plaintiff and Class members.

58. Cleo's violation of IPIPA, HIPAA Privacy and Security Rules, and Section 5 of the FTCA constitutes negligence per se.

59. D.W. 1, D.W. 2, and Class members are within the class of persons that IPIPA, HIPAA Privacy and Security Rules, and Section 5 of the FTCA were intended to protect.

60. The harm occurring as a result of the Data Breach is the type of harm that IPIPA, HIPAA Privacy and Security Rules, and Section 5 of the FTCA were intended to guard

against. The FTC has pursued enforcement actions against businesses, which, as a result of their failure to employ reasonable data security measures and avoid unfair practices or deceptive practices, caused the same type of harm that has been suffered by D.W. 1, D.W. 2, and Class members as a result of the Data Breach.

61. Cleo breached these duties by failing to exercise reasonable care in safeguarding and protecting D.W. 1, D.W. 2, and Class members' PII by failing to design, adopt, implement, control, direct, oversee, manage, monitor, and audit appropriate data security processes, controls, policies, procedures, protocols, and software and hardware systems to safeguard and protect PII entrusted to it—including D.W. 1, D.W. 2, and Class members' PII.

62. It was reasonably foreseeable to Cleo that its failure to exercise reasonable care in safeguarding and protecting D.W. 1, D.W. 2, and Class members' PII by failing to design, adopt, implement, control, direct, oversee, manage, monitor, and audit appropriate data security processes, controls, policies, procedures, protocols, and software and hardware systems would result in the unauthorized release, disclosure, and dissemination of D.W. 1, D.W. 2, and Class members' PII to unauthorized individuals.

63. But for Cleo's negligent conduct or breach of the above-described duties owed to D.W. 1, D.W. 2, and Class members, their PII would not have been compromised.

64. As a result of Cleo's above-described wrongful actions, inaction, and want of ordinary care that directly and proximately caused the Data Breach, D.W. 1, D.W. 2, and Class members have suffered and will suffer injury, including, but not limited to: (i) a substantial increase in the likelihood of identity theft; (ii) the compromise, publication, and theft of their PII; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from unauthorized use of their PII; (iv) lost opportunity costs associated with effort attempting to

mitigate the actual and future consequences of the Data Breach; (v) the continued risk to their PII which remains in Cleo's possession; and (vi) future costs in terms of time, effort, and money that will be required to prevent, detect, and repair the impact of the PII compromised as a result of the Data Breach.

**COUNT II**
**VIOLATIONS OF THE ILLINOIS CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT, 815 ILCS 505/2, et seq. ("ICFA")**

65. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

66. Cleo offered and continues to offer business software services in the State of Illinois.

67. D.W. 1, D.W. 2, and Class members received services from Cleo's clients for personal, family, or household purposes.

68. Cleo engaged in unlawful and unfair practices in violation of the ICFA by failing to implement and maintain reasonable security measures to protect and secure its clients' customers' PII in a manner that complied with applicable laws, regulations, and industry standards.

69. Cleo's duties also arise from the Illinois Personal Information Protection Act, 815 ILCS 530/45(a) which requires:

> A data collector that owns or licenses, or maintains or stores but does not own or license, records that contain personal information concerning an Illinois resident shall implement and maintain reasonable security measures to protect those records from unauthorized access, acquisition, destruction, use, modification, or disclosure.

815 ILCS 530/45. Cleo violated this duty by failing to implement reasonably secure data security policies.

70. Cleo further violated the ICFA by failing to notify its clients' customers of the Data Breach in a timely manner. The Illinois Personal Information Protection Act requires entities that experience a data breach to notify Illinois residents "in the most expedient time possible and without unreasonable delay." 815 ILCS 530/10. Violation of the Illinois Personal Information Protection Act constitutes an unlawful practice under the ICFA. 815 ILCS 530/20.

71. Due to the Data Breach, D.W. 1, D.W. 2, and Class members have lost property in the form of their PII. Further, Cleo's failure to adopt reasonable practices in protecting and safeguarding its clients' customers' PII will force D.W. 1, D.W. 2, and Class members to spend time or money to protect against identity theft. D.W. 1, D.W. 2, and Class members are now at a higher risk of medical identity theft and other crimes. This harm sufficiently outweighs any justifications or motives for Cleo's practice of collecting and storing PII without appropriate and reasonable safeguards to protect such information.

72. As a result of Cleo's violations of the ICFA, D.W. 1, D.W. 2, and Class members have suffered and will suffer injury, including, but not limited to: (i) a substantial increase in the likelihood of identity theft; (ii) the compromise, publication, and theft of their PII; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from unauthorized use of their PII; (iv) lost opportunity costs associated with effort attempting to mitigate the actual and future consequences of the Data Breach; (v) the continued risk to their PII which remains in Cleo's possession; and (vi) future costs in terms of time, effort, and money that will be required to prevent, detect, and repair the impact of the PII compromised as a result of the Data Breach.

## PRAYER FOR RELIEF

Plaintiff, on behalf of her minor children D.W. 1 and D.W. 2, and all other members of the Class, respectfully requests that the Court enter judgment in her favor and against Defendant as follows:

A. Certifying the Class as requested herein, designating Plaintiff as Class Representative, and appointing Plaintiff's counsel as Class Counsel;

B. Awarding D.W. 1, D.W. 2, and the Class appropriate monetary relief, including actual damages, statutory damages, punitive damages, restitution, and disgorgement;

C. Awarding D.W. 1, D.W. 2, and the Class equitable, injunctive, and declaratory relief, as may be appropriate. Plaintiff, on behalf of her minor children D.W. 1 and D.W. 2, and the Class, seeks appropriate injunctive relief designed to prevent Defendant from experiencing another data breach by adopting and implementing best data security practices to safeguard PII and to provide or extend credit monitoring services and similar services to protect against all types of identity theft and medical identity theft;

D. Awarding D.W. 1, D.W. 2, and the Class pre-judgment and post-judgment interest to the maximum extent allowable;

E. Awarding D.W. 1, D.W. 2, and the Class reasonable attorneys' fees, costs, and expenses, as allowable; and

F. Awarding D.W. 1, D.W. 2, and the Class such other favorable relief as allowable under law.

## JURY TRIAL DEMANDED

Plaintiff demands a trial by jury of all claims in this Class Action Complaint so triable.

Dated: April 14, 2025 Respectfully submitted,

/s/ Ben Barnow
Ben Barnow (IL Bar No. 0118265)
Anthony L. Parkhill (IL Bar No. 6317680)
Riley W. Prince (IL Bar No. 6339536)
Nicholas W. Blue (IL Bar No. 6343317)
**BARNOW AND ASSOCIATES, P.C.**
205 West Randolph Street, Suite 1630
Chicago, IL 60606
Tel: 312.621.2000
Fax: 312.641.5504
b.barnow@barnowlaw.com
aparkhill@barnowlaw.com
rprince@barnowlaw.com
nblue@barnowlaw.com

*Attorneys for Plaintiff*